Edward L. Clark and Jane Clark, Partners as William Clark's Son & Company, and Edward L. Clark *v.* The Pittsburg Natural Gas Company, William G. Park, James H. Park, De Witt C. Clapp, and Park, Brother & Company, Limited, Appellants.

*Equity practice—Amendment—Contracts.*

The limitation of the right of amendment of a bill in equity, is that it shall introduce no new cause of action, and the true criterion is to be found in the answer to the question, did the plaintiff so state his cause of action originally as to show that he had a legal right to recover what he subsequently claims?

A bill alleged a failure by a natural gas company, one of the defendants, to keep its contract for the supply of gas, with the plaintiff, and with B., another defendant, the failure being caused by a diminution in the amount of gas obtained by the company, and that B., by use of his power as owner of the large part of the company's stock, obtained more than his due proportion of the gas actually produced, that B. mismanaged the company and made fictitious charges against it, and intended, by fraudulent contrivances, to obtain a judgment and sell out and purchase the company's property; it prayed an injunction, a receiver, a decree to secure a proper apportionment of gas, and further relief. After considerable testimony had been taken, an amendment was allowed, setting up that the accounts between the gas company and B. were fraudulent, that B. had used the entire supply of gas, without paying for it, and owed a large sum to the company, and prayed a receiver to sell the property and an account. *Held,* the amendment was properly allowed.

Memoranda of agreement by a consumer to pay to a natural gas com-

pany, a certain sum per annum for fuel and light, there being no signa-tures thereto, and the books of the company not showing any such agreement, a resolution by the board of directors to enter into one was not sufficient to establish a contract between said consumer and the company that gas shall be furnished in sufficient quantities for the consumer's purposes, or render the company liable for a failure to supply gas.

Argued Nov. 3, 1897.   Appeals, Nos. 17, 18 and 19, Oct. T., 1897, by defendants, from decree of C. P. No. 2, Allegheny Co., July Term, 1891, No. 215, on bill in equity.   Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.   Affirmed.

Bill in equity for a receiver and an account.

The facts appear by the opinion of the court below by EWING, P. J., which was as follows :

The numerous exceptions filed to the master's report and the arguments thereon, are such that we have felt compelled to, and have read, the entire testimony and examined the principal exhibits.   The case is an old acquaintance.   The bill was filed May 8, 1891, and soon thereafter it was heard in court on application for preliminary injunction and appointment of receiver.   [We refused to appoint a receiver—not for lack of evidence justifying it, but as an exercise of discretion, believing that these parties, highly competent and respectable business men, would in the end better manage their affairs, and hoping that they would equitably settle their differences, and also on the defendants, Park Bros., who had absolute control of the gas supply, agreeing that Frank Wilcox should arrange the distribution of the gas supply so that the plaintiffs should have $\frac{15}{85}$ thereof, and Park Bro. & Co., Limited, $\frac{70}{85}$ thereof.   Afterwards it being shown to the court that the defendants had interfered and prevented this equitable division by turning off a part of plaintiffs' supply, and the court having announced that unless control of the division of the gas should be with some disinterested party a receiver would be appointed, the parties agreed on Frank Wilcox as such party, and the court having confidence in Mr. Wilcox's competency and integrity, he was on June 9, 1891, appointed and put in charge of this distribution.   On February 12, 1892, the defendants, without consulting Mr.

Wilcox, shut off the gas from plaintiffs' mill, for the reason that plaintiffs were in arrears for some two months' supply of gas. The court understood that Park Bros. had been regularly and monthly paid in cash in full their bill for gas. (My recollection is that an affidavit or affidavits to that effect was read at some stage of the case.) It now appears clearly that this was, to put it mildly, a mistake of the court, as the Parks had not paid for the gas received for several months before, but were credited for alleged damages by shortage of gas, which, settling with themselves as officers of the company, had been bringing the company regularly in debt to a large amount. Had the same harshness been exhibited towards Park Bros. that they (as officers of the gas company) meted to Clark & Son, the gas would have been shut off from the former months before it was shut off from the latter. The court, at the time, was at least under a misapprehension of the facts, and again, in 1892, refused to appoint a receiver. A master was appointed. We had lost sight of the case. In September, 1896, it was argued on exceptions to the master's report.] [12]

The master correctly gives a history of the company—the object of its formation and its operation—nominally a public corporation, its public duties were ignored, except so far that gas not needed for the officers and directors was sold to outsiders, with a stipulation for cutting them off on a shortage of gas. The directors and officers arranged to supply themselves at a price far below market value, (a third or fourth of the market value). [When gas became short, they cut off the outsiders for their own benefit, and worked harmoniously until the supply became short for themselves—this, about December, 1890, and then they began to quarrel, and instead of voluntarily selecting some competent and disinterested person to make an equitable distribution, they each tried to get the advantage of the other. The Parks, through their employees, and all the officers and all but one of the directors, being members of Park Bros. & Co., Limited, had the decided advantage in this unseemly contest, and the Clarks failed to get their full share of the gas.] [13] In June, 1891, Mr. Clark was dropped from the board of directors, and the entire board and the officers were either members or employees of Park Bros. While they submitted to the control of Mr. Wilcox, as to a distribution of gas,

until February 12, 1892, from the latter date the gas company's affairs were managed and controlled by Park Bros., as their own property, without regard to their duties to the public, and without regard to or consideration for the rights or interest of the minority stockholders. The finding of the master on this part of the case (excepted to by defendants' counsel) is a very mild statement of the facts established by the testimony.

In addition, in the first year after Clark was excluded from the directory, to wit: July 1, 1891, to July 1, 1892, the Parks had absolute control of the gas company, and nearly five months of the time they taking the entire product of the gas, not only did not pay anything for the gas used, but charged up against the gas company on its books, damages in their favor to the amount of $262,467.80, crediting the gas company with $111,294.05 for the same period, bringing the company in debt to the firm, $151,173.85 in one year, and this, in addition to the operating expenses of the company. In the four years, less one month, from July 1, 1892, to June 1, 1896, under the same absolute control, the Parks taking the entire product of gas, they credit the gas company with $69,200, and charge it with expenses of $88,099.41—a deficit of $19,101.41. A receiver for the company cannot do worse for it.

The exceptions filed to this branch of the master's report are dismissed.

We are of the opinion that the master is right in proceeding to state an account between Park Brothers and the company, and between Clarks and the company.

On the question of contracts of the firm of Clark & Son and Park Brothers with the gas company, the evidence seems to us to establish an agreement to furnish gas. There was no resolution passed by the board; there was no contract signed, and perhaps no distinct agreement, certainly no formal contract, as to terms ever made, further than the understanding that the gas was to be divided in accordance with the interest which each firm had in the stock of the gas company, that was $\frac{70}{85}$ to Parks, and $\frac{15}{85}$ to Clarks. This was understood to be the then relative capacity of the mills, and provision was made for gas for additions to be made to each mill, and the gas used in such additions was to be charged (by product) at forty per cent of the rates established by the associations of gas companies. Parks

were to pay for general supply $98,000 per year, and Clarks $21,000 per year; and charges were made and paid on this basis until a shortage of gas raised raised a contention.

The rates agreed on and paid were largely below the market value of the gas—how much does not distinctly appear—but judging by the price paid other companies, and by the testimony as to wholesale prices, it was probably not over one third or one fourth of the market value. Mr. Wilcox testifies that when he took charge of the distribution of supply, in June, 1891, the cost of gas furnished Park Brothers, at this arranged price, was at the rate of $3\frac{26}{100}$ cents per thousand feet. Clarks' would be at the same rate. At this time it is conceded that the supply had greatly fallen off. The gas obtained from the Commonwealth Company—at no time sufficient to furnish the $\frac{15}{85}$ for Clarks' mill—had decreased until it was scarcely an appreciable quantity. Taking the whole evidence, we are certain that taking the three years, from July 1, 1889, to July 1, 1892, the period of the contracts, the price paid under these contracts was not one half the market value of the gas actually supplied.

In March, 1891, Parks gave notice to Clarks that they were going to charge to the gas company the cost of all fuel bought. Clarks declined to keep an account of this, claiming that it was not the agreement. Clarks' contention was that they were not getting a fair division of the gas supply, and for that reason they were damaged by Park Brothers. W. G. Park, being president of Park Brothers, Limited, and president of the gas company, had credited to his firm on the books of the gas company these charges, including labor and a large amount of incidental expenses; in the eighteen months, January 1, 1891, to July 1, 1892, $321,376.45; and including similar charges, $3,004.01 for December, 1890, a total charge of $324,380.46 in nineteen months. In the month of June, 1891, when they were getting a large but not full amount of gas at $3\frac{26}{100}$ cents per thousand feet, the counter charge is $13,839.34; and in January and February, 1892, the charges are $27,433 and $25,304.19 respectively. The entry of these charges on the books of the gas company was all the payment that has been made for gas by the Parks for several months, since the year 1891, when they shut the gas off Clarks' mill for nonpayment of the monthly bill—although the loss to Clarks was relatively greater than to Parks, and this

the Parks, officers of the company, knew. This was grossly unjust and a wrong. While each party was getting gas in proper proportion it made but little difference to them that it was at a nominal price below market value.

If the bill had been filed by an outside stockholder, or by the state—these contracts should be held entirely void, as made improvidently and fraudulently, by officers and directors with themselves, regardless of the rights of others, and of the state, and they should be charged with the actual value of the gas used. But the present plaintiffs do not stand in the position of an innocent outside party. They are in the position of parties to the illegal arrangements, who have been overreached by their confederates.

[There is a great mass of testimony in regard to which party got the advantage in the distribution of gas. After reading it all, I am satisfied that Clarks had the worst of it. Parks had charge of the supply—and except for a short time in the early part of 1891, when the Commonwealth Company's supply was turned in—the gas had to pass Parks before it reached Clarks, and a valve above Parks' mill was used to turn down the supply at Clarks', and when Mr. Wilcox first examined, Parks had more than their share, and after he put in the necessary gaskets to distribute the gas, Clarks admittedly had more, and Parks less, gas than before, and the same thing was found when he was put in charge in the latter part of June, 1891. But it is impossible to now determine the amount of this difference. And up to February 12, 1892, when the gas was turned off Clarks' mill, it is fair to the parties to assume that, under the agreement to pay $98,000 and $21,000 per annum respectively, the parties were in equilibrio as to advantage.] [10]

[We are of the opinion that, even assuming the paper produced by Mr. Park, not signed, had been signed, it does not make the gas company liable for the cost of fuel furnished by Park Brothers on a shortage of gas. But assuming that the paper had been signed and stipulated in express terms for this liability, it would, under the circumstances, be void. At the time these alleged contracts were made it was notorious that gas wells were failing, and were liable to fail. The price of gas had been raised. It was usual in the contracts of gas companies to stipulate in time contracts against this liability. These

same parties, in dealing with others, uniformly put such a stip-
ulation in their contracts.  In making the contracts (if made)
the officers and directors were making contracts for their indi-
vidual benefit, and at prices merely nominal for the gas to be
furnished.  A reasonable foresight would have anticipated the
result of a liability for shortage—such as the testimony shows.
If the claim of Park Brothers of $324,000 is allowed, the com-
pany was bankrupted thereby at or before the termination of
the contract.  A proportionate sum of $66,000 should be added
for Clarks' damages—making $384,000 for nineteen months—
thus eating up former profits and value of the property, and
putting the company in such a condition that it could neither
pay taxes to the commonwealth, nor perform the duties for
which it obtained its franchise.] [11]  The master was right
in rejecting this entire charge of $324,380.

[As to the time intervening between February 12, 1892, and
July 1, 1892, on the whole evidence, the defendants, Park
Brothers, should be charged with the amount charged against
them, to wit: the customary monthly charge.  They had Clarks'
$\frac{15}{85}$ in addition to their own share.  If they had been paying for
it by meter or paying by product at the then market price,
it would have been as much and probably more than this
amount.] [9]   At July 1, 1892, there was no pretense of any
existing contract for supply of gas.   Clark had been excluded
from the directory and from all share in management of the gas
company in June, 1891, and the Clarks had been deprived of
their share of the gas in February, 1892.   The Park Brothers
were the sole directors, and the controlling officers of the cor-
poration.   They made no attempt to sell the gas product to any
one.   They did not permit Clarks to compete for it.   They con-
tracted with themselves for the entire supply at a price fixed by
themselves.   They permitted no voice but their own to be heard
in the selection of the parties who would undertake to estimate
the amount and value of the gas, but themselves fixed the
price at $2,000 per month, and in the same way they reduced
that price in November, 1893, to $1,200 per month.   In the
meantime, they, at the expense of the gas company, drilled
nine new wells—most, if not all of which, were fair producers.
No addition to the rental was made therefor; they also, at the
company's expense erected and operated a pump house and

pumps to increase the pressure; these together amounting in cost to nearly the whole amount with which they charge their firm with gas for the three years and eleven months from July 1, 1892, to June 1, 1896. The operating expenses were considerably increased thereby. The rentals received from use of pipes and the proceeds of sale of old material were also taken, and the company brought out in debt.

A reasonable regard for appearances, or a fair regard for the rights of the minority stockholders, would have required some consultation with them as to the selection of the expert to estimate the product and manner in which it should be treated. The same consideration would have required an offer to permit competition as to price.

[There were two ways in common use as to fixing the amount of gas consumed. One, an easy way, and most accurate, was a meter (so arranged that the consumer could not manipulate it); another, a price on the product of the iron by the ton. One or the other of these methods was used by the independent companies furnishing gas to Park Bros. during this period. Having ignored all these reasonable methods of doing justice to others interested, they should not complain of a liberal allowance against them. On their side, is the estimate of their own selected experts, and the persuasive testimony of their witnesses as to the value of the coal it would take to run the entire plant. A sufficient answer to the testimony of the last witness is the amount of the bills for fuel claimed on shortage of gas from January, 1891, to July, 1892. The court coincides with the master in his estimate of the relative technical knowledge and experience and reliability of Mr. Wilcox as an expert—and with the estimate of his competency and fairness by all the partners, when in June, 1891, he was agreed on to make distribution of the gas between the parties. On the whole evidence we are satisfied that the amount of gas received by Park Bros. during this period was very much greater than the amount with which they have charged themselves.

The defendants should have given evidence as to the time—hours in the day and days that they operated, using this gas. They have not given any such evidence directly. It is only incidentally that they have so done, and the master has charged them as for a constant operation. Incidentally it is indicated,

as would be the presumptions without evidence, that they do not operate on Sunday, only using gas enough to prevent cooling down of furnaces and for light. Then for a part of this period it is notorious that the iron and steel business was dull, and it is not probable that they ran constantly at night. Taking the whole testimony we are of the opinion and so find, that the charges made by the master for this period should be reduced by one third—and that with this reduction the defendants will have no good reason to complain of the remaining charge. It is as low as the evidence justifies. We do not understand that either party objects to the master's calculation of interest. The correction can therefore be made by deducting one third of the amount without a recalculation of interest.] [8]

As to the credits to Park Bros. during the same period we will not interfere, though had the master not passed on it we would have recharged them with the fees of their counsel, charged by them to the gas company, for this litigation. This has been a contest in which Park Bros. & Co., Limited, are the parties interested against the complainant. The gas company, as such, is interested on the other side of the contention.

The findings of the master as to the balance due from Clark & Son are affirmed.

[The account of the gas company against Park Bros., Limited, will then stand thus, including interest up to the date of master's findings, July 1, 1896:

| | |
|---|---|
| To amount due July 1, 1892, with interest from that date, . . . . | $157,093 48 |
| For gas from July 1, 1892, to June 1, 1896, 2-3 of $285,609.28 . . . . | $170,406 19 |
| | $327,499 67 |
| Credit by amount found by master, | 94,780 64 |
| Balance, . . . . . . | $232,719 03][7] |

Except as herein sustained or modified the exceptions to the master's report are dismissed. The recommendations of the master are approved with this modification:

As there are apparently other outstanding obligations of the Pittsburg Gas Company not included in the credits allowed Park Bros., these obligations will have to be ascertained.

Seventy eighty-fifths of the net balance will be coming Park Bros. as stockholders if the affairs of the company are wound up, and the parties are undoubtedly good for the amount. The receiver to be appointed will not proceed to collect the balance found owing by either party without special order of the court.

Let a decree be prepared by counsel in accordance with the findings of the master as modified in the foregoing opinion. The costs, including the master's fee, to be hereafter fixed, and the stenographer's fee to be paid $\frac{15}{85}$ by the plaintiffs and $\frac{70}{85}$ by Park, Bro. & Co., Limited.

The court entered the following final decree:

And now, to wit: October 31, 1896, . . . . it is considered, adjudged and decreed that an injunction issue under the seal of the court, perpetually enjoining and restraining the said William G. Park, D. E. Park, James H. Park, DeWitt C. Clapp and Park, Bro. & Co., Limited, from interfering directly or indirectly with any of the property, gas lines, pumps, wells, gas, books, accounts, moneys, or other matters and things of the Pittsburg Natural Gas Company, and William M. Kennedy is appointed receiver of all of the property and effects, rights and credits, books, papers and records of the said Pittsburg Natural Gas Company, and it is ordered that the said receiver, upon the approval of his bond hereinafter ordered, shall forthwith take possession of all of said property and effects, books, papers and records, and shall proceed to wind up said company and sell and dispose of its property and franchises under the direction of the court, and that until said property shall be sold he shall sell the gas produced by said company to the best advantage of said company, and that he shall collect and receive all debts and sums of money due and owing to said company. And it is further ordered, adjudged and decreed that the said Park, Bro. & Co., Limited, are indebted to said company for natural gas heretofore furnished and supplied by it to them in the sum of $232,719.03, as of June 1, 1896, and that the said Park, Bro. & Co., Limited, shall and do pay over to the said receiver the said sum of $232,719.03, with interest thereon from June 1, 1896. And it is further ordered, adjudged and decreed that Jane Clark, the surviving partner of the said William Clark's Son & Co., is indebted to the said company for natural gas

heretofore furnished and supplied by it to the said complainants
in the sum of $6,067.55, as of June 1, 1896, and that the said
Jane Clark shall and do pay over to the said receiver the said
sum of $6,067.55, with interest thereon from June 1, 1896.
And it is further ordered that said receiver shall not issue exe-
cution against either the said Park, Bro. & Co., Limited, or the
said Jane Clark, for the respective sums so as aforesaid decreed
against them, until the further order of court. And it is fur-
ther ordered and decreed that upon payment of said sums of
money to the said receiver he shall distribute the same as fol-
lows, to wit: first, to the costs and expenses of the receivership
and the administration of the assets of said company; second,
to the payment of the just and lawful debts (if any) of the said
company; and third, the $\frac{15}{85}$ part of the residue to the said Jane
Clark, and the remaining $\frac{70}{85}$ part of the residue to the said
Park, Bro. & Co., Limited, and that all other moneys realized
by the receiver belonging to said company, and from the sale
of the gas and of the property and effects of said company, shall
be distributed in the same manner and proportion.

And it is further ordered, that the said Jane Clark pay $\frac{15}{85}$
and that the said Park, Bro. & Co., Limited, pay $\frac{70}{85}$ of the cost
of these proceedings, including the fee of John D. McKen-
nan, Esq., the master first appointed by the court, of $200, and
the fee of James S. Young, Esq., the master appointed upon
resignation of said John D. McKennan, Esq., of $1,800, and in-
cluding the bill of the reporter and stenographer before the two
masters, which bill is now taxed and allowed at the sum of
$659.93, $560.80 thereof to be paid to Miss C. Newell, and $99.13
thereof to be paid to Reno & Beatty. [1]

*Errors assigned* among others were (1) decree of the court,
quoting it; (7–13) portions of opinion as above, quoting them.

*Johns McCleave* and *George B. Gordon*, with them *D. T.
Watson, John Dalzell* and *William Scott*, for appellant, cited as
to the amendment: Howard v. Boro. of Olyphant, 181 Pa. 191.
Cited as to the amount due the gas company: Youghiogheny
Nat. Gas Co. v. Westmoreland Paper Co., 158 Pa. 559.

*M. A. Woodward*, with him *George Shiras, 3d, C. C. Dickey*
and *W. K. Shiras*, for appellees, cited as to the amendment:

Dick's App., 106 Pa. 589; Shepp v. Norristown Pass. Ry., 10 Montg. Co. Ct. Rep. 41.

Cited as to the question of fraud, Sage v. Culver, 147 N. Y. 241; Meyer v. Staten Island Ry. Co., 7 N. Y. State Rep. 245; Jackson v. Ludeling, 21 Wallace, 616; Ervin v. Oregon Ry. & Nav. Co., 27 Fed. Rep. 630; Menier v. Hooper's Telegraph Works, L. R. 9 Ch. App. 350; Farmers' L. & T. Co. v. N. Y., etc., Ry. Co., 150 N. Y. 410; Cunningham's App., 122 Pa. 464; Spencer's App., 80 Pa. 317; Parshall's App., 65 Pa. 224; Mullen v. Doyle, 147 Pa. 512; Kimberly v. Arms, 129 U. S. 527: Brotherton v. Reynolds, 164 Pa. 134; Citizens' Pass. Ry. v. Harrisburg Pass. Ry. Co., 164 Pa. 274; Stocker v. Hutter, 134 Pa. 19.

OPINION BY MR. JUSTICE FELL, January 3, 1898:

As the relief granted is under the prayers of the amended bill the objection to the allowance of the amendment should be considered first. If it was improperly allowed the decree must be set aside. The averments of the original bill are: that the Pittsburg Natural Gas Co. was incorporated mainly for the purpose of supplying natural gas to the works of the plaintiffs, William Clark's Son & Co. and those of Park, Bro. & Co., one of the defendants; that each of the said parties contracted with the company for a supply of gas at its works for three years; that since the gas company had become unable to furnish a full supply to both, Park & Co. had, by the use of their power as owners of $\frac{70}{85}$ of the stock, obtained more than their proportionate share of gas; that they were mismanaging the company and making fictitious charges against it, and intended by fraudulent contrivances to obtain a judgment against it, sell its property and become the sole owners thereof. The prayers were for the appointment of a receiver to manage the affairs of the company, to defend the threatened suit, to secure a proper apportionment of the gas to the parties, for an injunction, etc. After an answer and replication had been filed, and but seven pages of the twelve hundred of testimony had been taken, an amendment was allowed by the court in which it is alleged that the accounts between the Gas Co. and Park & Co. were incorrect and fraudulent; that Park & Co. had been using the entire supply of gas without making compensation therefor, and that a large sum

was due by them to the gas company. The additional prayers were for the appointment of a receiver to sell the property, and for an account.

The subject-matter of the amendment was germane to and in enlargement of the substantial purpose of the bill, and there was no abuse of discretion in its allowance. It was based mainly on knowledge acquired after the filing of the bill, and it was asked for in accordance with the rules of court. The prayer for an accounting might have been added to those of the original bill. The Act of May 4, 1864, sec. 2, P. L. 775, permits amendments in proceedings in equity, at the discretion of the court, which affect the merits of the matter in controversy and expedite justice, in the same manner as obtains in common law cases and practice. Referring to this act, SHARSWOOD, J., in the opinion in Wilhelm's App., 79 Pa. 120 said: " We are thus by legislative mandate for rules as to amendments in equity proceedings, referred to those which prevail in ' common-law cases and practice,' intending no doubt to incorporate all of the provisions of the acts of assembly, and to make one uniform system for both classes of suits," and that while the limit of the power of amendment is that no new cause of action can be introduced, " the true criterion is, as all the authorities show, did the plaintiff so state his cause of action originally as to show that he had a legal right to recover what he subsequently claims."

The most important subject of controversy before the master was the charge of $324,380.46 made by Park & Co. for fuel purchased by them to supply their works after the supply of gas received from the gas company became insufficient. This extraordinary charge was made at a time when Park & Co., by reason of their ownership of seventy eighty-fifths of the stock, were in absolute control of the management of the gas company. A part of the time they were receiving the entire product of gas, and at no time were they charged with more than one fourth or one third of the market value of the gas. In the first year of their absolute control, during five months of which they received all of the gas the company was able to furnish, they credited it with $111,294.05 for gas used, and charged it with $262,467.80 as damages for a failure to furnish a full supply. If this charge rested on a lawful agreement, clear and distinct in its terms, it would have to be sustained, ruinous as it would be to the com-

pany.  The plaintiffs are not in a position to contest the legality of such an agreement, if made.  They are not innocent stockholders of a corporation whose officers have made improvident and unlawful contracts with themselves.  They were parties to whatever agreement was made with Park & Co. and secured a like agreement for themselves; and in a proceeding to secure their individual rights only, in which no question of public rights or duties is involved, they are estopped.  They claim however that no such agreement was made, and this claim is sustained by the testimony.  No formal contract was made, no resolution was passed by the board of directors, and the minutes and books show no such agreement.  It is extremely doubtful whether there was any understanding except for a division of the gas between the parties in proportion to the interest which they had as stockholders.  The company was not organized or conducted with the intention that it should perform any public duty.  Its franchises were obtained and used solely to serve the private interests of the stockholders.  They agreed upon a division of the gas proportionate to their holdings of stock, and in all contracts with other parties they carefully provided against claims for damages by reserving the right to cancel the contracts.  When the supply had been cut off from others, and became insufficient to supply their works they for a time held out to each other the promise of a fair division.  That this method of adjustment was considered by them is some indication of their understanding of their rights at the time, and that the unsigned memoranda now set up as evidence of an agreement to furnish a full supply were intended only to provide for a division of the supply.  In fact, the only force these memoranda have as evidence of any understanding is that the parties apparently acted under them in making a division.  After July, 1892, there is no pretense of a contract except such as was made by the officers of the company with themselves as members of a copartnership.

With what amount Park, Bro. & Co. should be charged for gas used by them after July 1, 1892, is a question by no means free of difficulty.  The difficulty results in part from their failure to use means to ascertain the amount they consumed when they were dealing with the property of the gas company as if it were their own.  We find no reason however which

would justify us in setting aside the finding of the court upon the subject, and it is unnecessary to enter upon a discussion of it. By a motion to amend the decree attention has been called to an error in calculation made by the learned judge. In reducing the sum of $285,609.28 charged by the master for the use of gas from July 1, 1892, to June 1, 1896, one third, the amount of the charge is fixed at $170,406.19 instead of $190,406.19. This is clearly an error of calculation, and has been carried into the decree.

The decree is now corrected by fixing the sum to be paid by Park, Bro. & Co. at $252,719.03 instead of $232,719.03.

With this correction the decree is affirmed at the cost of the appellant.